(R.D. 11409)

THE H. K. FERGUSON COMPANY *v.* UNITED STATES

(Decided November 30, 1967)

*Thompson, Hine & Flory* (*William D. Ginn* and *Thomas A. Mason* of counsel) for the plaintiff.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

LANDIS, Judge: The sole issue, stipulated (collective exhibit 1) in this appeal, is whether the amount of 302,060 deutsche marks included in the appraisement of two oxygen converters and associated equipment imported at Houston, Texas, is part of constructed value under section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 19 U.S.C., section 1402. Plaintiff claims it should not be.

Oxygen converters are basic equipment designed to cut down the time of the heat cycle in converting pig iron to steel. The converters of this appeal were manufactured by Pintsch Bamag, Koln-Bayenthal, West Germany, under purchase order from The H. K. Ferguson Company, Incorporated, Cleveland, Ohio, at a price which the record puts at well over two million deutsche marks. The disputed DM302,060 is the amount of a connected purchase order between the same firms for so-called "engineering" services.

Seven entries are involved. The converters were exported from West Germany between September 1960 and June 1961 in knockdown condition. They are installed in a steel-making plant at Pueblo, Colorado, engineered and constructed by The H. K. Ferguson Company, Incorporated, for the Colorado Fuel and Iron Company.

The appraiser prorated the amount of DM302,060 over the seven shipments at the approximate rate of 11.111 percent of the basic con-

tract prices for each invoice item. The appraisements, contract prices, and prorated amount for the several entries are stipulated as follows:

| Entry No. | Appraised Value (Including pro-rated engineering) | Contract Price | Pro-rated Engineering |
|---|---|---|---|
| 3618–H | 604, 718 | 538, 199 | 66, 519 |
| 4511–H | 177, 390 | 157, 877 | 19, 513 |
| 5650–H | 901, 934 | 802, 721 | 99, 213 |
| 5952–H | 56, 220 | 50, 036 | 6, 184 |
| 8681–H | 697, 614 | 620, 876 | 76, 738 |
| 9321–H | 229, 839 | 204, 557 | 25, 282 |
| 456–H | 78, 283 | 69, 672 | 8, 611 |
| Totals | 2, 745, 998 | 2, 443, 938 | 302, 060 |

NOTE: All figures in Deutch Marks rather than dollars.

Constructed value, the conceded proper basis for valuation of these converters, is defined in section 402 (d), as amended, *supra*, as follows:

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

Items 2 and 3 of constructed value are not in dispute. The parties substantially agree that, as a matter of law and where supported by the facts, fees paid for services which having nothing to do with fabrication or other processing of any kind employed in producing merchandise are not part of constructed value. *Brauner & Co.* v. *United States*, 44 Cust. Ct. 661, Reap. Dec. 9673; *F. W. Myers & Co., Inc.* v. *United States*, 52 Cust. Ct. 550, Reap. Dec. 10750; *Erb & Gray Scientific, Inc.* v. *United States*, 53 CCPA 46, C.A.D. 875, discussed *infra*.

Customs officials have followed this principle in their administrative decisions. 95 Treas. Dec. 124, T.D. 55079(2). Plaintiff argues that the connected DM302,060 fee paid to Pintsch Bamag was exclusively for "know-how" and technical advices wholly unrelated to the purchase order for the converters and equipment as such. Defendant contends that what plaintiff says is not sufficiently proved on this record.

Mr. John E. Montgomery, director of the Division of Mining and Metallurgy for The H. K. Ferguson Company, Incorporated, testified for the plaintiff. He was the only witness. He stated that The H. K. Ferguson Company, Incorporated (hereinafter referred to as Ferguson), is an engineering and construction company engaged in all types of industrial construction. It contracted with the Colorado Fuel and Iron Company to engineer and design the installation of a plant capable of producing one million tons of quality steel per year using a then relatively new, at least in the United States, basic oxygen process. He estimated the approximate value of the completed plant to be about eight million dollars. Since Ferguson had no previous experience in the basic oxygen process of producing steel, it purchased the equipment for the plant from Pintsch Bamag and, at the insistence of Colorado Fuel and Iron Company, arranged with Pintsch Bamag to make available its technical know-how and experience in basic oxygen process installation. This, he said, was the essence of the engineering services detailed in the connected purchase order amounting to DM302,060. (Defendant's exhibit A.) Questioned for more detail about the engineering services, Mr. Montgomery replied as follows on direct examination:

Q. And in your answer keep that in mind; that we are talking about that engineering services arrangement that you made with Pintsch Bamag. Would you describe, sir, for the court these engineering services which were supplied by Bamag for this fee?— A. Bamag furnished us the information required to arrange the equipment in the proper sequence as required—Well, the operation techniques that had been developed as required by these operating techniques, maintenance techniques, and the process perimeters. For example, in sampling your vessels, certain procedures are required, and they require certain design considerations, and there are certain relationships, say, between the vessel and the hood. There are certain relationships required in tapping the vessel into the ladels, and this is the type of knowledge and service that Pintsch Bamag was furnishing us. In addition, they furnished direction supervisors to this country. We also had people over for consultation to establish the design criteria both in Cleveland and in Colorado for meetings. And prior to this time, people in our company also had meetings in Europe with the Pintsch Bamag Company and the client.

Q. Now, as far as the over-all plant design, that is the performance of your services to the C. F. & I., in designing and engineering the total plant, in what way, if any, did Pintsch Bamag's services relate

to your performance of that engineering contract?—A. Pintsch Bamag's services supplements our standard engineering knowledge with the necessary process, data, and requirements in the art of the process.

Q. Was any use made of European experience in connection with the services performed by Pintsch Bamag for you?—A. It was all European experience.

Q. And would you explain in what way the European experience was relevant to the engineering services contract?—A. Well, the engineering services required the experience or the operating techniques developed through the experience, and the knowledge of this was in the hand's [sic] of the Europeans rather than the American sources that were available to us.

Q. And this was the type of thing or knowledge that you obtained from Pintsch Bamag under this contract, is that correct?—A. That is correct.

Q. Now, with respect to the layout and the specifications for your total plant that you were building, in what way, if any, was that specification and detail of the total plant developed from or supplied by Pintsch Bamag?—A. *In* [sic] *was all interrelated.* The requirements for the auxiliary equipment, most of which was purchased in the United States, was set by process requirements. For example, the quantity of gases released during the reactions in the vessel, that information was given to us by Bamag, the amount of gas to expect, and the rate of revolutions so we could design and specify the gas collection system or the dust collection system. The cooling water requirements. The temperature of the water required to the unit, and from the unit, and the quantities of water required to size the piping and select the pumps. This is the type of information we gained from Bamag. [Emphasis supplied.]

Q. Was there any information that dealt with maintenance of the plant or operation of the plant once it had been constructed?—A. Yes, the operating techniques were a part of the information transmitted to us, and the way they would affect the design.

Q. And what about the maintenance of the plant once constructed?—A. We were given instructions on maintenance experience in Europe with reference to this type of equipment.

Q. And with respect to safety features involved in this process, was any of that type of information involved in what came from Pintsch Bamag?—A. That's right, recommendations were given to us for the amount of excess air to allow to be drawn into the hood to maintain a noncombustible mixture throughout the dust collecting; the out of gas system, and the dust collecting system.

Q. With respect to the physical equipment that was purchased from Pintsch Bamag, in what condition did that arrive in this country?—A. It arrived in a knocked down condition and had to be welded and erected in the field. For example, the body of the vessel was in, I believe, four sections, and the trunnion ring—There is a trunnion ring that the body of the vessel is supported in in an installed condition, and this trunnion ring was shipped in two portions. The drive

equipment was shipped in a knocked down condition and had to be assembled, the motors, the speed reducers, and so on.

Q. Did any of Pintsch Bamag's services relate to this erection of the equipment in the United States?—A. Yes, they furnished direction supervisors. [R. 27–31.]

Mr. Montgomery also stated that the manufacture of the oxygen converters and associated equipment required fabrication engineering, such as sizing, to adapt the particular equipment to the particular plant, but that this was included in the overall price of the equipment rather than in the connected purchase order for engineering services which, he said, had nothing to do with fabrication.

The best evidence of what the DM302,060 was intended to cover is the connected purchase order and two change orders under which that amount was paid. (Defendant's exhibit A.) Identified with the job for Colorado Fuel and Iron Company, it opens with a statement of confirmation to Pintsch Bamag to "Furnish in accordance with your proposal No. K/VAM/21–GR/MS dated August 5, 1959, all engineering on the following equipment:", and goes on to recite in sheet 1 the major items of equipment involved in the Colorado installation. Sheet 2 identifies the items to be engineered as follows:

| | | |
|---|---|---|
| A–1. | The engineering on two (2) converter vessels for a price of | 82,200 DM Marks |
| A–2. | Price of engineering the converter bearings for | 25,600 DM Marks |
| A–3. | A price of engineering of two (2) complete tilting assemblies | 26,200 DM Marks |
| A–4. | Price of engineering of the converter supports for two (2) converters | 26,000 DM Marks |
| B. | The price for the engineering on the lancing mechanism and lances for the sum of | 44,000 DM Marks |
| C. | A price for engineering two (2) control booths for the converter operation for | 33,000 DM Marks |

Accessory transfer equipment:

| | | |
|---|---|---|
| A. | A price for the engineering on two (2) ladle cars for steel ladle of 125 short tons for a price of | 24,600 DM Marks |
| B. | For the engineering of two (2) slag ladle cars having a capacity of 260 cubic foot capacity at a price of | 17,200 DM Marks |
| | Total Cost | 278,800 DM Marks |

The foregoing change orders attached to and made a part of the connected purchase order identify the change orders as "issued to cover Engineering Costs for equipment by P. O. No. 2121–C–2." Change order No. 1 specified:

| | |
|---|---|
| Furnish all Engineering for two (2) Water Cooled Hoods for a price of | DM 18,400. |

| | |
|---|---|
| Total Price this Change Order | DM 18,400. |
| Value of Original Order | DM 278,800. |

| | |
|---|---|
| Revised Total Price | DM 297,200. |

All other terms and conditions of the original order remain unchanged.

Change order No. 2 specified:

| | |
|---|---|
| Furnish all Engineering for two (2) Converter Lip Rings for a price of | DM 4,960. |

| | |
|---|---|
| TOTAL PRICE THIS CHANGE ORDER | DM 4,960. |
| VALUE ORIGINAL ORDER AND C/O. No. 1 | DM 297,200. |

| | |
|---|---|
| REVISED TOTAL PRICE | DM 302,160. |

ALL OTHER TERMS AND CONDITIONS OF THE ORIGINAL ORDER AND CHANGE ORDER No. 1–REMAIN UNCHANGED.

Defendant's exhibit B is an interoffice memorandum dated August 26, 1964, from J. E. Montgomery to Mr. B. J. Coyne on the subject of "EQUIPMENT PURCHASED UNDER H. K. FERGUSON P. O. No. 2121–C–2." Therein Mr. Montgomery stated:

In connection with the performance of a contract to build a Basic Oxygen Steel Making Facility for Colorado Fuel & Iron Corporation, we purchased a converter and related equipment from Bamag Koln-Bayenthal, West Germany. Bamag equipment was selected as their standard equipment met the specification requirements established by H. K. Ferguson engineers and Colorado Fuel & Iron representatives.

Subject equipment is available in standard design from both foreign and domestic vendors. Catalog data and both detail and erection drawings are available from each respective vendor. However, most installations require dimensional and detail changes for adaptation to a specific plant layout and to auxiliary equipment purchased from others.

The equipment purchased under H. K. Ferguson P. O. No. 2121–C–2 from Bamag required design revisions to their standards. Certain changes were required for adaptation to the Colorado Fuel & Iron plant layout, other existing plant equipment, new equipment purchased from others, and difference in electrical characteristics.

H. K. Ferguson required the revised drawings from Bamag in order to finalize design of the foundations, structural steel, piping, and

electricals for the complete plant. Also, the revised drawings were required for assembly and erection of the purchased equipment.

The drawings furnished by Bamag are what are commonly known in this country as vendor shop drawings which are ordinarily furnished on such items ranging from valves to complete power plants.

When asked where the work in connection with purchase order No. 2121–C–2 was done and what engineering on two converter vessels meant, Mr. Montgomery stated that part of the services were done in Germany and part in this country and as to the meaning of engineering:

A. As stated therein, it means the specific knowledge. For example, that the diameter of the vessel, to get the proper metallurgical action, should be a certain relationship to the height; that the reaction that goes on in the vessel is at a certain rate; that is the carbon is burned off at a certain rate. It is their specific knowledge, as related, that allows us to go ahead with our engineering, allows them to make drawings that they can transmit to us for our use in laying out the over-all plant and designing the over-all plant.

Q. Is there anything in that specific statement where they are billing for the engineering on two converter vessels; that states that they are billing you for knowledge, or does it state that they are billing you for engineering? Now, what does engineering mean?—A. Engineering is the——

Q. The work. Doesn't it mean the work on the article?—A. Well, there is a lot—Yes, it possibly means work but not necessarily the fabrication work on the article.

Q. *Not necessarily fabrication work but it means work on the imported article?*—A. *This is correct.*

Q. Now, what part of this work was done in Germany and what part was done here you do not specifically know, do you?—A. *I couldn't say fifty-fifty or something like that. I couldn't answer that.*

Q. Now, "A–2" states, "Price of engineering the converter bearings." Does not this indicate a specific physical effort?—A. This indicates that a bearing is selected, and that this bearing has certain process requirements. It requires cooling water, it requires lubrication, it requires—From a maintenance standpoint, you have to allow room to get into the bearing and remove it, and this is all shown in the drawings prepared as part of this work.

Q. Now on all these figures indicated on sheets 2, 3, and 4 you do not know whether or not all the work detailed thereon was done in Germany?—A. I can't specifically say that all the work was done in Germany.

Q. And you can't specifically say that it wasn't done in Germany?— A. I can say part of it was done in Germany and part——

Q. But you don't know which part was done in Germany and which part was done in the United States, is that correct?—A. *Not as a total.*

There are specific items I can point out. [No such items were pointed out.]
[Emphasis supplied, R. 45–47.]

I have referred to the record in some detail because the facts are crucial. Plaintiff contends that, under existing case law, fees for engineering know-how and technical advice may not be a part of constructed value. The *Brauner* case, *supra*, cited by plaintiff and defendant, turned on the fact that the services which the importer bargained for in connection with his basic equipment contract were optional services unrelated to the equipment purchased and, therefore, no part of the cost of fabricating the equipment. In *F. W. Myers*, *supra*, the significant issue was that the services (installation), performed in the United States, had nothing to do with fabrication. Our court of appeals discussed the principle, *Erb & Gray Scientific, Inc.* v. *United States*, 53 CCPA 46, C.A.D. 875, when, in affirming the appellate term of this court, it stated:

The appellate term reversed the decision and judgment of the trial court, pointing out that whereas in the *Brauner* case, supra, the fee paid by the importer was an optional remittance for services which embraced installation, assistance, and technical advice:

[t]his option was not available to the importer in the instant case. Once it prevailed upon the shipper to continue maintaining its New York office, it obligated itself to include, as part of the purchase price, the agreed contribution toward the expenses of that office. It became a condition of the purchase of each instrument, inasmuch as these microscopes were no longer sold to plaintiff at a price which did not include the said service fee.

The evidence in this case is not so clear cut. I read Mr. Montgomery's testimony to suggest a distinction between the expense of engineering and fabricating the standard converter equipment as distinguished from the expense of engineering the revisions in the standard equipment under connected contract. The equipment purchase contract is not in evidence (R. 39), nor, for that matter is Bamag's proposal dated August 5, 1959, referred to in Ferguson's connected purchase order dated September 25, 1959. (Defendant's exhibit A.) I have no doubt that a good deal of "know-how" and technical advice were tied into the Bamag contract. However, payment for that know-how seems to have been inextricably bound up with engineering revisions completed in Germany on the equipment itself and plaintiff offered no proof as to the value of the specific engineering revisions furnished in West Germany and in the United States. *Lionel Trading Co., Inc.* v. *United States*, 24 CCPA 432, T.D. 48900.

An engineering revision of standard equipment is a fabrication or process of producing the equipment as much as is fabricating the basic

standard equipment. And the cost of engineering the revision is part of the overall cost of fabrication. In *Ford Motor Company v. United States*, 29 Cust. Ct. 553, A.R.D. 9, the second division, appellate term, held that pattern equipment of American manufacture, used in the production of imported rough iron castings, is an essential item of the cost of "fabrication, manipulation, or other process employed in manufacturing or producing" merchandise under the old cost of production valuation basis since "[i]ts purpose is to derive, not the manufacturer's actual cost, but the actual cost of manufacture." (At page 556, 557.) Constructed value then takes in not only the cost of fabricating standard equipment but also the cost, albeit under connected contract, of any revisions fabricated in the equipment as imported.

Upon this record, I find that plaintiff has failed to overcome the presumption of correctness attached to the values returned by the appraiser. 28 U.S.C., section 2633.

I find as facts:

1. That the merchandise of this appeal consists of two oxygen converters and associated equipment, constructed in West Germany and exported in a knockdown condition between September 1960 and June 1961, after the effective date of the Customs Simplification Act of 1956; that said merchandise is not an article on the final list of the Secretary of the Treasury (T.D. 54521), and, therefore, is to be appraised under section 402 of the Tariff Act of 1930, as amended by said act.

2. That, on or about the date of exportation, such or similar merchandise was not freely sold or offered for sale in Germany for exportation to the United States.

3. That, on or about the date of exportation, such or similar merchandise was not freely sold or offered for sale for domestic consumption in the United States.

4. That appraisement was made on the basis of constructed value under section 402(d), Tariff Act of 1930, as amended, at 2,443,938 deutsche marks, plus so-called engineering fees in the total amount of 302,060 deutsche marks, a total of 2,745,998 deutsche marks.

5. That plaintiff has failed to prove that the amount of 302,060 deutsche marks was not part of the cost of fabrication or other processing of any kind employed in producing such merchandise in West Germany.

I conclude as matter of law:

1. That, at the time of exportation, there was no export value or United States value for the oxygen converters and associated equipment, subject of this appeal, as such values are defined in section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

2. That constructed value, as defined in section 402 (d) of the Tariff Act of 1930, as amended, is the proper basis of appraisement of such merchandise.

3. That plaintiff has failed to overcome the presumptively correct appraised values of the merchandise in this appeal and that the constructed values are the values returned by the appraiser.

Judgment will be entered accordingly.